1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| NEW FRONTIER INVESTMENT AG, et al.,<br><br>        Petitioners,<br><br>    v.<br><br>BITCENTER, INC.,<br><br>        Respondent. | Case No.  23-mc-80154-PHK<br><br>**ORDER DENYING NEW FRONTIER INVESTMENT AG AND NEW FRONTIER HOLDING GMBH'S PETITION TO PARTIALLY VACATE AN ARBITRATION AWARD PURSUANT TO 9 U.S.C. §§ 10 AND 201**<br><br>Re: Dkt. No. 1 |

Now before the Court is New Frontier Investment AG and New Frontier Holding GmbH's (collectively "Petitioners") Petition to Partially Vacate an Arbitration Award pursuant to 9 U.S.C. §§ 10 and 201.  Fundamentally, this is a dispute over control of a Hungarian software company, as between certain shareholders of the company, on the one hand, and a lender to the company seeking to enforce terms of a convertible loan agreement, on the other hand.  The Parties completed an international arbitration proceeding to resolve the dispute.  The instant Petition follows a Final Written Decision issued in favor of Respondent BitCenter, Inc. ("BitCenter") in ICDR Case No. 01-22-0002-6915 ("the arbitration").  After carefully reviewing the Parties' briefings and after oral argument, the Court **DENIES** the Petition.

## I.        BACKGROUND

### A.        The Parties and Contractual Provisions Relevant to the Underlying Arbitration.

Both Petitioners New Frontier Investment AG and New Frontier Holding GmbH are Austrian companies with principal places of business in Vienna, Austria.  [Dkt. 1-4 at 87]. Respondent BitCenter is a Delaware company with a principal place of business in Mountain View,

California.  *Id.*  XAPT Szoftver Tanácsadó Korlátolt Felelösségü Társaság ("XAPT") is a third-party Hungarian company which has four main shareholders.  *Id.* at 7.  Petitioners hold 49.52% of XAPT's shares.  *Id.*

On January 30, 2020, Petitioners and BitCenter entered into an agreement in which BitCenter agreed to lend €3,000,000 to XAPT pursuant to terms set forth in a Framework Agreement ("FWA") and Convertible Loan Agreement ("CLA").  *Id.* at 6.

The FWA is "governed by the law of the State of California, USA, to the extent permissible by Hungarian law."  *Id.* at 80–81.  The CLA is "governed by and shall be construed in accordance with the law of the State of California, USA, without giving effect to its principles or rules of conflict laws."  *Id.* at 107.  The CLA's terms afford BitCenter the option to convert all or part of the €3,000,000 outstanding loan into XAPT shares.  *Id.* at 7.  Upon receiving a Conversion Notice from BitCenter, BitCenter avers XAPT shareholders were obligated under the CLA to convene at a shareholder's meeting and approve the necessary actions required to convert the loan.  *Id.*  At oral argument, Petitioners made clear they are not challenging the Arbitrator's finding that the indebtedness here can be validly converted.  Transcript of Oral Argument at 6:12-14, *New Frontier Investment AG v. BitCenter, LLC*, No. 23-mc-80154-PHK (N.D. Cal. Dec. 19, 2013) (Hereafter "Hearing Transcript").

On December 7, 2021, BitCenter provided XAPT with the requisite Conversion Notice to convert a loan balance of €3,665,092.47 to XAPT shares, comprised of €3,000,000 in unpaid principal and €665,092.47 in accrued interest.  *Id.* at 8.  In accordance with the CLA, XAPT convened multiple shareholder meetings intending to approve the conversion of BitCenter's loan.  *Id.*  During the series of shareholder meetings, Petitioners abstained or voted against BitCenter's conversion.  *Id.* at 9.  Because of the magnitude of Petitioners' shareholdings in XAPT, Petitioners' actions impeded the requisite steps for the corporation to complete the conversion.  *Id.*  At oral argument, Petitioners made clear they are not challenging the Arbitrator's finding that Petitioners breached their obligations under the relevant agreements by refusing to approve the resolutions needed to affect the conversion.  Hearing Transcript at 6:5-11.  The failure of the conversion led to the underlying dispute and subsequent arbitration.  *Id.*

United States District Court
Northern District of California

### B.     Background of the Underlying Arbitration and Procedural History.

Pursuant to an arbitration clause in the FWA, Petitioners and BitCenter agreed to resolve this dispute using the International Centre for Dispute Resolution, with the arbitration's seat being in San Francisco, California. *Id.* Grant L. Kim ("the Arbitrator") was appointed as the sole arbitrator and, after briefing and hearing, ultimately issued a Final Award on February 28, 2023, concluding Petitioners breached their agreement with BitCenter. *Id.* at 68. The Arbitrator found BitCenter's shares convertible, requiring Petitioners to specifically perform their obligations under the FWA and CLA. *Id.* The Final Award mandated specific performance of the Petitioners to cast a vote of "for" to ensure the conversion of BitCenter's loan into shares during a shareholders meeting. *Id.* at 69–71. Additionally, BitCenter was awarded an option to substitute a written legal declaration of "for" should the Petitioners fail to comply with the specific performance order. *Id.* at 69–75.

On May 26, 2023, Petitioners filed with this Court the instant Petition to Partially Vacate the Arbitration Award. [Dkt. 1]. BitCenter filed an opposition to the partial vacatur on June 26, 2023. [Dkt. 16]. On July 18, 2023, Petitioners filed a Reply in Support of Petition. [Dkt. 20].

On August 2, 2023, BitCenter filed a motion for sanctions. [Dkt. 23]. Subsequently, Petitioners filed its opposition. [Dkt. 30]. BitCenter then withdrew the motion for sanctions. [Dkt. 33]. On December 1, 2023, the Court heard extensive oral argument on the instant petition to vacate, at the end of which hearing both Parties agreed that the matter was submitted. [Dkt. 34].

## II.     MAGISTRATE JUDGE AND FEDERAL SUBJECT MATTER JURISDICTION

### A.     Magistrate Judge Jurisdiction

As an initial matter, this Court has jurisdiction to hear and decide this matter because Petitioners and BitCenter consented to Magistrate Judge jurisdiction under 28 U.S.C. § 636(c). *Washington v. Kijakazi*, 72 F.4th 1029, 1035 (9th Cir. 2023) (citing *Roell v. Withrow*, 538 U.S. 580, 585 (2003); 28 U.S.C. § 636(c)(1); Fed. R. Civ. P. 73(a)); Dkts. 5, 12 (Petitioners and BitCenter consented to Magistrate Judge jurisdiction).

### B.     Federal Subject Matter Jurisdiction

This Court must determine if it has jurisdiction to hear the case because "[i]t is the duty of federal courts to assure themselves that their jurisdiction is not being exceeded." *HayDay Farms,*

1    *Inc. v. FeeDx Holdings, Inc.*, 55 F.4th 1232, 1238 (9th Cir. 2022) (citing *In re Ryther*, 799 F.2d

2    1412, 1414 (9th Cir. 1986)).  The Supreme Court has repeatedly emphasized "district courts have

3    an 'independent obligation to address subject-matter jurisdiction *sua sponte*.'" *Grupo Dataflux v.*

4    *Atlas Glob. Grp., L.P.*, 541 U.S. 567, 593 (2004).

5         Federal courts are courts of limited jurisdiction.  *See, e.g.*, *Kokkonen v. Guardian Life Ins.*

6    *Co. of Am.*, 511 U.S. 375, 377 (1994).  Federal courts can only adjudicate cases which the

7    Constitution or Congress authorizes them to adjudicate, typically cases involving a "federal

8    question" or involving "diversity of citizenship." *Id.*  The Supreme Court held that, in the context

9    of a petition to confirm or vacate an arbitration award, courts must look at the face of the petition

10   itself to determine if the Court has jurisdiction. *Badgerow v. Walters*, 142 S. Ct. 1310, 1316 (2022).

11   Courts may not "look through" the petition to the underlying substantive dispute to determine if a

12   basis for jurisdiction exists.  *Id.* at 1317–18 ("the look-through method for assessing jurisdiction

13   should not apply").

14        Petitioners aver "federal question" jurisdiction pursuant to 9 U.S.C. § 203 because the instant

15   Petition is governed by the New York Convention for International Arbitration and aver "diversity"

16   jurisdiction pursuant to 28 U.S.C. Section 1332 because "Petitioners are international business

17   entities, Respondent is a business entity residing in California, and the amount in controversy

18   exceeds the statutory minimum." [Dkt. 1 at 8].

19        First, the Court has jurisdiction based on a federal question pursuant to 28 U.S.C. Section

20   1331.  Section 1331 indicates federal courts shall have jurisdiction over civil actions "arising under

21   the Constitution, laws or treaties of the United States."  Under Sections 9 and 10 of the FAA, a party

22   may petition the court to confirm, or alternatively to vacate, an arbitral award.  Yet, the FAA's

23   "authorization of a petition does not itself create jurisdiction." *Badgerow*, 142 S. Ct. at 1314.

24   Rather, courts must have an "independent jurisdictional basis" to resolve the matter. *Id.* (citing *Hall*

25   *Street Associates, L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 582 (2008)).  If the petition alleges federal

26   law (beyond Sections 9 or 10 itself), then this Court has jurisdiction pursuant to Section 1331. *Id.*

27   at 1316.

28        Arbitration awards involving at least one foreign party are governed by the Convention on

United States District Court
Northern District of California

4

the Recognition and Enforcement of Foreign Arbitral Awards ("The Convention") which Congress incorporated into federal law in the FAA. *HayDay Farms*, 55 F.4th at 1239 (citing *Convention Done at New York June 10, 1958*; T.I.A.S. No. 6997 (Dec. 29, 1970); 9 U.S.C. § 202). "Section 203 [of the FAA] provides federal district courts subject matter jurisdiction over actions or proceedings falling under the Convention." *Id.* (citing *Day v. Orrick, Herrington & Sutcliffe, LLP*, 42 F.4th 1131, 1133 (9th Cir. 2022)). Here, Petitioners aver they are foreign corporations, specifically Austrian corporations. [Dkt. 1 at 7]. "[U]nder § 203, any petition to confirm, vacate, or modify an international arbitration award is federal in character." *HayDay Farms*, 55 F.4th at 1239 (finding district court had jurisdiction). Therefore, this Court has jurisdiction to adjudicate the instant Petition based on a "federal question" because the instant Petition falls within the scope of the Convention.

Second, the Court has jurisdiction based on "diversity" pursuant to 28 U.S.C. Section 1332. Section 1332(a)(2) grants district courts original jurisdiction over civil actions between "citizens of a State and citizens or subjects of a foreign state" when the amount in controversy exceeds $75,000. *HayDay Farms*, 55 F.4th at 1238; *Nike, Inc. v. Comercial Iberica de Exclusivas Deportivas, S.A.*, 20 F.3d 987, 990 (9th Cir. 1994) (applying this standard to foreign corporations). A corporation is a citizen of the state where it is incorporated and where it has its principal place of business. *3123 SMB LLC v. Horn*, 880 F.3d 461, 462–63 (9th Cir. 2018) (quoting 28 U.S.C. § 1332(c)(1)). "It has long been established that '[d]iversity jurisdiction does not encompass foreign plaintiffs suing foreign defendants.'" *Id.* at 1238–39 (quoting *Faysound Ltd. v. United Coconut Chems., Inc.*, 878 F.2d 290, 294 (9th Cir. 1989)). The amount-in-controversy requirement is examined on the face of a well-pleaded complaint. *Sky-Med, Inc. v. Fed. Aviation Admin.*, 965 F.3d 960, 965 (9th Cir. 2020) (citing *Horton v. Liberty Mut. Ins. Co.*, 367 U.S. 348, 353 (1961)).

Here, looking at the face of the Petition, Petitioners meet the diversity requirement. The Petition indicates BitCenter is incorporated in Delaware and has a principal place of business in Mountain View, California. [Dkt. 1 at 7]. The Petition indicates Petitioners' only citizenship is Austria, a foreign state. *Id.* Accordingly, this action on the instant Petition is between a domestic corporation and foreign corporations which satisfies the diversity of citizenship requirement under

1  Section 1332.

2     Next, the amount in controversy must exceed $75,000 for this Court to have jurisdiction. 28

3  U.S.C. § 1332. As explained above, the amount in controversy requirement is based on the face of

4  the well-pleaded complaint. *Sky-Med, Inc.*, 965 F.3d at 965. Prior to *Badgerow*, the Ninth Circuit

5  used a "mixed approach" to determine if the amount in controversy is met in petitions following a

6  final arbitration decision. *Theis Rsch., Inc. v. Brown & Bain*, 400 F.3d 659, 663–665 (9th Cir. 2005)

7  (noting a split among the circuits on this issue); Kristen M. Blankley, *A Muddy Mess: The Supreme*

8  *Court's Jurisprudence on Jurisdiction for Arbitration Matters*, 77 U. Miami L. Rev. 676, 722

9  (2023). The Ninth Circuit indicated courts should consider the final amount granted in the

10  arbitration award unless a party sought to reopen the arbitration. *Theis Rsch.*, 400 F.3d at 664–65

11  ("[T]he cases have turned upon whether the party seeking to vacate an arbitration award also sought

12  to reopen the arbitration."); Blankley, *A Muddy Mess*, 77 U. Miami L. Rev. at 722. In other words,

13  the Ninth Circuit requires district courts to consider the *amount being claimed in the arbitration* to

14  determine if that amount meets or exceeds the jurisdictional threshold if the petitioning party sought

15  to reopen the arbitration. *Id.*

16     However, the Supreme Court's rejection of a "look through" approach to jurisdiction in

17  *Badgerow* would appear to impact, if not preclude, the Ninth Circuit's "mixed approach" of looking

18  at the amount claimed in the arbitration to determine jurisdiction in a case seeking to reopen the

19  arbitration, as enunciated in *Theis Research*. *Badgerow*, 142 S. Ct. at 1317–18 ("the look-through

20  method for assessing jurisdiction should not apply"); Blankley, *A Muddy Mess*, 77 U. Miami L. Rev.

21  at 722. Given the recency of the *Badgerow* opinion, the Ninth Circuit has yet to clarify the impact

22  of *Badgerow* in determining the amount-in-controversy for the purposes of diversity jurisdiction in

23  a case involving a petition to vacate an arbitration award. This Court has identified one post-

24  *Badgerow* district court opinion in the Ninth Circuit which denied a petition because the "court

25  cannot tell based on the 'face' of the Petition whether the citizenship of the parties is diverse, nor

26  whether the amount-in-controversy exceeds $75,000." *Dunbar v. Airbnb, Inc.*, No. 21-cv-00451-

27  JMS (WRP), 2022 WL 17067455, at *2 (D. Haw. Nov. 17, 2022).

28     In this case, however, this Court need not resolve the identified tension between *Bagerow*

and *Theis Research* because, on the face of the instant Petition here, the Petitioners do not seek to reopen arbitration. [Dkt. 1 at 2, 8]. Accordingly, the *Theis Research* "mixed approach" is not directly implicated. *Theis Rsch.*, 400 F.3d at 664–65. Thus, this Court need only determine if the final amount granted in the arbitration award exceeds the amount in controversy requirement. *Id.* In the instant Petition, the face of the Petition explicitly states that the Arbitrator found in his Final Award that the €3,000,000 convertible loan remained unpaid, that BitCenter properly provided a conversion notice, that Petitioners took steps to frustrate the conversion of that €3,000,000 loan (plus interest) amount into XAPT shares, and that Petitioners seek to vacate the Arbitrator's Final Award which grants relief for that breach in the form of specific performance requiring Petitioners cast a vote "for" the conversion of the €3,000,000 loan (plus interest) to XAPT shares (along with the alternative written declaration effectuating the same if Petitioners fail to cast a vote). [Dkt. 1 at 3]. This award based on the €3,000,000 loan (and the equivalent shares that amount of money represents) exceeds the jurisdictional amount in controversy requirement of $75,000. Dkt. 1 at 4; *Maltby Biocontrol, Inc., et al. v. Biobest N.V., et al. Additional Party Names: Barbara Maltby, Howard Maltby*, No. 12-cv-142-PA (OPX), 2012 WL 12951472, at *1–2 (C.D. Cal. May 14, 2012) (finding jurisdiction based in diversity because of a convertible loan agreement exceeding $75,000). Therefore, on the face of the petition, Petitioners have met the amount in controversy requirement.

Finally, at the hearing on the petition, both Parties agreed that this Court has both personal and subject matter jurisdiction over this case. Hearing Transcript at 32:20-25.

Accordingly, this Court possesses jurisdiction pursuant to both Sections 1331 and 1332.

### III.    STANDARD OF REVIEW

The grounds for vacatur of an arbitration award are governed by the FAA. *HayDay Farms*, 55 F.4th at 1240. Section 10(a)(4) of the FAA grants the Court an "extremely limited authority to review arbitration awards." *Id.* at 1239. Review of an arbitration decision is "limited and highly deferential." *Coutee v. Barington Cap. Grp., L.P.*, 336 F.3d 1128, 1132 (9th Cir. 2003) (quoting *Sheet Metal Workers' Int'l Ass'n Loc. Union No. 359 v. Madison Indus., Inc. of Arizona*, 84 F.3d 1186, 1190 (9th Cir. 1996)). "'Neither erroneous legal conclusions nor unsubstantiated factual findings justify federal court review' of an arbitral award[.]" *Aspic Eng'g & Constr. v. ECC*

7

*Centcom Constructors LLC*, 913 F.3d 1162, 1166 (9th Cir. 2019) (quoting *Bosack v. Soward*, 586 F.3d 1096, 1102 (9th Cir. 2009)). Section 10(a)'s limited grounds are "designed to preserve due process but not to permit unnecessary public intrusion into private arbitration procedures." *Kyocera Corp. v. Prudential-Bache Trade Servs.*, 341 F.3d 987, 998 (9th Cir. 2019). The burden of establishing grounds for vacating an arbitration award is on the party seeking vacatur. *See Emps. Ins. of Wausau v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 933 F.2d 1481, 1489 (9th Cir. 1991).

## IV.  DISCUSSION

Petitioners (collectively "New Frontier") seek to partially vacate the arbitration award under the provisions of the FAA and the Convention. [Dkt. 1]. An arbitral award may be vacated when an arbitrator: (A) exceeds their power in conferring the award; or (B) violates an explicit, well-defined, and dominant public policy of the forum state in conferring the award. *See HayDay Farm*, 55 F.4th at 1239–1241; *Stead Motors of Walnut Creek v. Auto. Machinists Lodge No. 1173*, 886 F.2d 1200, 1212-13 (9th Cir. 1989) (en banc) ("[a] court must both delineate an overriding public policy rooted in something more than general considerations of supposed public interests, and, of equal significance, it must demonstrate that the policy is one that specifically militates against the relief ordered by the arbitrator."); *Matthews v. Nat'l Football League Mgmt. Council*, 688 F.3d 1107, 1111 (9th Cir. 2012). At oral argument, Petitioners made clear they are seeking vacatur of the award on "exceeding powers" and "manifest disregard" grounds solely on the FAA. Hearing Transcript at 33:7-10.

First, in order to show that the Arbitrator exceeded his powers here, Petitioners must show the Arbitrator: (1) manifestly disregarded the law or (2) his award was completely irrational in light of the parties' contractual agreement. *Kyocera Corp.*, 341 F.3d at 997. Second, in order to show that the Arbitrator violated public policy, Petitioners must show the Arbitrator violated a "well-defined and dominant policy" that violates the forum state's "most basic notions of morality and justice." *United Food & Com. Workers Int'l Union, Loc. 588 v. Foster Poultry Farms*, 74 F.3d 169, 174 (9th Cir. 1995) (citations omitted); *accord W.R. Grace & Co. v. Loc. Union 759, Int'l Union of United Rubber, Cork, Linoleum & Plastic Workers of Am.*, 461 U.S. 757, 766 (1983). At oral argument, Petitioners made clear they based their "public policy" vacatur arguments solely on the

New York Convention.  Hearing Transcript at 33:1-6.

### A.    Whether the Arbitrator Exceeded His Powers in Conferring the Final Award.

Courts *must* confirm an arbitration award unless the award is vacated pursuant to Section 10.  *Hall St. Assocs.*, 552 U.S. at 582 (citing 9 U.S.C. § 9).  Section 10 provides that courts may vacate an arbitral award "where the arbitrators exceeded their powers."  A party seeking relief under Section 10(a)(4) faces a "high hurdle."  *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671 (2010).  "It is not enough for petitioners to show that the panel committed an error—or even serious error." *Id.* (citing *E. Associated Coal Corp. v. United Mine Workers of Am., Dist. 17*, 531 U.S. 62, 57, 62 (2000)).  "[C]onfirmation [of an arbitration award] is required even in the face of erroneous findings of fact or misinterpretations of law."  *Kyocera Corp.*, 341 F.3d at 997 (citing *French v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 784 F.2d 902, 906 (9th Cir. 1986) (internal quotation marks omitted in original)).  Courts must enforce an arbitrator's decision unless the arbitrator's decision: (1) "exhibits a manifest disregard of the law" or (2) is "completely irrational." *Kyocera Corp.*, 341 F.3d at 997.  The Parties agreed at oral argument that the issue of whether or not the arbtitrator exceeded his powers rises and falls on the issue of whether the arbitrator exhibited a manifest disregard of the law.  Hearing Transcript at 32:6-19.

### 1.    Whether the Arbitrator Exhibited a Manifest Disregard of the Law.

Manifest disregard of the law is a judicially recognized ground for vacatur under 9 U.S.C. § 10(a)(4).  *Comedy Club, Inc. v. Improv W. Assocs.*, 553 F.3d 1277, 1290 (9th Cir. 2009).  To demonstrate a manifest disregard of the law, "the moving party must show that the arbitrator understood and correctly stated the law[] but proceeded to disregard the same."  *HayDay Farms*, 55 F.4th at 1241 (citing *Bosack*, 586 F.3d at 1104).  The ignored law must be "well defined, explicit, and clearly applicable."  *Collins v. D.R. Horton, Inc.*, 505 F.3d 874, 880 (9th Cir. 2007) (citation and quotation marks omitted). To vacate an award on this ground, "[t]here must be some evidence in the record, *other than the result*, that the arbitrators were aware of the law and intentionally disregarded it."  *HayDay Farms*, 55 F.4th at 1241 (citing *Bosack*, 586 F.3d at 1104) (emphasis added).

"'Manifest disregard of the law' means something more than just an error in the law or a

1    failure on the part of the arbitrators to understand or apply the law." *Lagstein*, 607 F.3d at 641

2    (quoting *Mich. Mut. Ins. Co. v. Unigard Sec. Ins. Co.*, 44 F.3d 826, 832 (9th Cir. 1995)).

3    "[E]rroneous legal conclusions . . . [do not] justify federal court review of an arbitral award under

4    the statute[.]" *Kyocera Corp.*, 341 F.3d at 994.

5            Petitioners aver the Arbitrator exhibited a manifest disregard of law in three instances: (a)

6    by misinterpreting the applicability of Hungarian law regarding the prohibition of specific

7    performance, (b) by incorrectly applying Hungarian law concerning the impermissibility of

8    substitute declarations, and (c) by misconstruing the approval timeline under the Hungarian

9    government's New Foreign Direct Investment Government Decree ("FDI Act"). [Dkt. 1-2 at 13–

10   15]. The Court address each in turn.

11                     **a.** **Whether the Arbitrator Exhibited a Manifest Disregard of the Law**
                        **Regarding Specific Performance as a Form of Relief Under Hungarian**
12                     **Law.**

13           The FWA states "[a]ny controversy or claim arising out of or relating to this Agreement, or

14   the breach thereof, shall be settled by arbitration . . . Loan agreement shall be governed by the laws

15   of the State of California, USA, to the extent permissible by Hungarian law, without regard to choice

16   of law principles." [Dkt. 1-4 at 82–83]. The CLA's "Governing Law" clause provides "[t]his

17   Agreement is governed by and shall be construed in accordance with the law of the State of

18   California, USA, without giving effect to its principles or rules of conflict of laws to the extent such

19   principles or rules would require or permit the application of the laws of another jurisdiction." *Id.*

20   at 107.

21           Petitioners argue that the Arbitrator manifestly disregarded the law by ignoring Hungarian

22   law's purported fundamental distinction between contract and corporate law. [Dkt. 1-2 at 11].

23   Specifically, Petitioners argue that the Arbitrator's Final Award which includes a remedy award of

24   specific performance was a display of a manifest disregard of the law. *Id.* at 13. Petitioners argue

25   that "Hungarian law does not permit a court or arbitrator to force a [shareholder] to change its vote,

26   even if that vote was in breach of its obligations as a matter of contract law." *Id.* Petitioners argue

27   that the Arbitrator "discusse[d] the difference between contract and corporate law" and allegedly

28   dismissed the concern "out of hand." *Id.* In support of their contentions, Petitioners cite the expert

United States District Court
Northern District of California

10

opinion of their lawyer Dr. Balázs Fazakas.  *Id.*  Fazakas's expert report states—without citing binding precedent or statute—that a shareholders' agreement cannot usurp a shareholders' meeting under Hungarian law.  [Dkt. 1-3 at 9–10].  Petitioners further argue that the Arbitrator's conclusion "disregard[ed] contract provisions to achieve a desired result."  Dkt. 1-2 at 17 (quoting *Aspic Eng'g*, 913 F.3d at 1167).

BitCenter responds that Petitioners' arguments are not only "mere[] complaints that [the Arbitrator] got the law wrong," but "are inaccurate in that [the Arbitrator] far from ignore[ed] Hungarian law, [but] went on to consider Hungarian law and pointed out that [Petitioners'] own expert reports stated that an order for specific performance would be enforced by the Hungarian courts."  [Dkt. 16 at 3–4].

Here, the Court finds Petitioners have not met their burden demonstrating the Arbitrator "recognized the applicable law and then ignored it."  *Comedy Club*, 553 F.3d at 1291.  Petitioners do not point to specific facts showing that the Arbitrator (1) recognized Hungarian law's purported fundamental distinction between contract and corporate law and then (2) displayed a manifest disregard of that law.  On the contrary, the Arbitrator was fully briefed on the issue, [dkt. 1-4 at 463], he considered Hungarian law, *id.* at 61–62, and he made a good faith determination of the applicability of Hungarian law, *id.*  Petitioners' asserted issues with the Arbitrator's approach here are an inadequate basis for vacating an arbitration award.  *See Bosack*, 586 F.3d at 1104 (absent "some evidence in the record, other than the result, that the arbitrators were aware of the law and intentionally disregarded it" vacatur is inappropriate).  "The risk that arbitrators may construe the governing law imperfectly in the course of delivering a decision that attempts in *good faith* to interpret the relevant law, or may make errors with respect to the evidence on which they base their rulings, is a risk that every party to arbitration assumes, and such legal and factual errors lie far outside the category of conduct embraced by Section 10(a)(4)."  *Kyocera Corp.*, 341 F.3d at 1003 (emphasis added).  The record demonstrates that the arbitrator here analyzed and reached a good faith interpretation of the law on the issues complained of by Petitioners, and under such circumstances "[t]he mere submission of authority to an arbitrator (even when the arbitrator requests it, which happens in most if not all arbitrations), cannot possibly give rise to a claim that the

1  arbitrator 'recognized' that authority." *Jenks v. DLA Piper (US) LLP*, No. 13-cv-05381-VC, 2014

2  WL 3381947, at *7 (N.D. Cal. July 10, 2014).

3  　　At the merits hearing, Petitioners pointed to paragraphs forty-eight through fifty of the Final

4  Award to support their argument that the Arbitrator acted with a manifest disregard of the law.

5  Transcript of Oral Argument at 11–12, *New Frontier Investment AG v. BitCenter, LLC*, No. 23-mc-

6  80154-PHK (N.D. Cal. Dec. 19, 2013) (Hereafter "Hearing Transcript").  Petitioners pointed to

7  paragraph forty-eight in particular of the Final Award as illustrating their position: that the Arbitrator

8  correctly understood and stated the law, but then proceeded to disregard it.  *Id.* at 13.  Petitioners

9  argue that the opinion of their expert witness (the so-called Lakatos Opinion) correctly states the

10  law and, because the Arbitrator did not rule in accordance with the Lakatos Opinion, the Arbitrator

11  proceeded to disregard the law.  *Id.*

12  　　However, paragraph forty-eight of the Final Award, taken in context of the surrounding

13  analysis, indicates the Arbitrator attempted to engage with the Lakatos Opinion in good faith.  The

14  Final Award directly cites to other portions of that opinion supporting a contrary interpretation on

15  the enforceability of the specific performance award under Hungarian law.  Dkt. 1-4 at ¶ 48 ("On

16  the contrary, the Lakatos Opinion states: . . . 'the award would be enforceable under Hungarian law

17  as well.'"); Hearing Transcript at 12.

18  　　The Petitioners further argued in reliance on paragraph forty-nine of the Final Award to

19  argue that the Arbitrator acknowledged Hungarian law would bar enforcement of specific

20  performance by imposing a fine for non-compliance. Hearing Transcript at 13–15.  Petitioners

21  contend that the Arbitrator's subsequent issuance of the award, in purported contravention of

22  Hungarian law, serves as evidence of the Arbitrator's manifest disregard of the law.  Hearing

23  Transcript at 13–15.

24  　　However, paragraph forty-nine of the Final Award demonstrates the Arbitrator's good faith

25  interpretation, because the Arbitrator concluded that "The [Lakatos Opinion's] reference to

26  'impos[ing] a fine for non-compliance' confirms that a Hungarian court would recognize an arbitral

27  award of specific performance, since no fine could be imposed unless the award is enforceable."

28  [Dkt. 1-4 at ¶ 49].

United States District Court
Northern District of California

12

United States District Court
Northern District of California

1   Additionally, Petitioners' brief cites *Aspic Engineering* to support their argument that the

2   Arbitrator displayed a manifest disregard of the law.  [Dkt. 20 at 11 (citing *Aspic Eng'g*, 913 F.3d

3   at 1167)].   Petitioners argue by analogy that, like the *Aspic Engineering* arbitrator, the instant

4   Petition's Arbitrator's "apparent views about the appropriateness of specific performance" shows

5   he "disregarded contract provisions to achieve a desired result."  *Id.*  Petitioners' reliance on *Aspic*

6   *Engineering* is inapplicable to the instant Petition, because *Aspic Engineering* is readily

7   distinguishable from the instant Petition.   In *Aspic Engineering*, the Ninth Circuit held that an

8   arbitrator exceeded his authority and issued an "irrational" award because he "disregarded specific

9   provisions of the *plain text* in an effort to prevent what the arbitrator deemed an unfair result."  *Aspic*

10  *Eng'g*, 913 F.3d at 1168 (emphasis added). The *Aspic Engineering* arbitrator recognized that an

11  express contractual provision required the Plaintiff to adhere to certain federal regulations, but

12  declined to enforce the provision because that arbitrator considered it "unjust" to enforce the

13  regulations against "a seemingly less sophisticated contractor."  *Id.*

14  By contrast, here the instant dispute's Arbitrator did not supplant the express terms of the

15  FWA and CLA with his own notions of fairness.  Here, unlike in *Aspic Engineering*, the Arbitrator's

16  decision drew its essence from the FWA, CLA, and Hungarian law.  [Dkt. 1-4 at 20 ("[A]ll Parties,

17  including New Frontier agreed to resolve disputes arising from the FWA and the CLA by arbitration.

18  Under Hungarian law, that arbitration agreement is valid and enforceable, including with respect to

19  'corporate' disputes.  The Lakotos Opinion on which New Frontier relies confirms that this dispute

20  is arbitrable and that an award requiring New Frontier to perform its conversion obligations would

21  be enforceable under Hungarian law.")].   Indeed, Petitioners here do not allege that the Arbitrator

22  here ignored the plain text of either the FWA or CLA, unlike the arbitrator in *Aspic Engineering*.

23  There is nothing in the plain text of either agreement which prohibits granting relief in the form of

24  specific performance.  *Id.* at 82–83, 108.  Rather, Petitioners' arguments rely on materials outside

25  the four corners of the agreements, by citing to multiple expert reports on Hungarian law to argue

26  that the Arbitrator manifestly disregarded that law.  [Dkt. 1-2 at 13–15, 19–20].

27  Finally, the Court notes that Petitioners did not argue, in the merits phase of the arbitration,

28  that the Arbitrator lacked authority to grant specific performance.  Rather, Petitioners only raised

13

the issue of specific performance during jurisdictional arguments and not in relation to the merits of the case. Indeed, Petitioners concede that the issue of specific performance, purportedly displaying manifest disregard for the law, was presented to the Arbitrator in "the context of a jurisdictional challenge." Hearing Transcript at 11–12 ("Now, the way this was teed up in the arbitration itself was in the context of a jurisdictional challenge."), 19 ("[The Arbitrator is] grappling with the law as it pertains to jurisdiction. This is the way it was teed up for him. This is the way the parties presented it to him, and that may be a fault of the parties for not presenting it to him in the specific form that we're arguing it now."). During oral argument, Petitioners conceded that they "didn't believe" the issue of specific performance was briefed and argued to the Arbitrator here on the merits stage of that proceeding. Hearing Transcript at 20. After conducting independent review of the record, the Court is unable to locate any merits arguments made by Petitioners to the Arbitrator relating to specific performance.

Accordingly, for this additional reason the Court finds the Arbitrator did not display a manifest disregard of the law because the Petitioners failed, at the first step, to show that the Arbitrator was made "aware" of the law on the merits. *HayDay Farms*, 55 F.4th at 1241 (citing *Bosack*, 586 F.3d at 1104) ("[t]here must be some evidence in the record, other than the result, that the arbitrators *were aware of the law* and intentionally disregarded it."). Petitioners failed to brief or argue in a comprehensive manner about the Hungarian law regarding specific performance, at the merits stage, and instead they chose to raise the issue only in the earlier context of jurisdictional arguments. Chronologically, by the time the arbitration proceeded to the merits stage, Petitioners essentially abandoned arguing that specific performance was a contrary form of relief under Hungarian law. Accordingly, the Arbitrator was unaware of any merits-based arguments challenging specific performance as an available remedy. And therefore, the Arbitrator cannot be held to have manifestly disregarded the law when the issue of specific performance was not squarely raised as an argument at the merits stage. Given the fashion in which the issue was presented, the Arbitrator here can hardly be faulted (as Petitioners attempt to do) for addressing the specific performance issue as only one of several threshold jurisdictional issues, and not as part of a detailed discussion about remedies at the merits stage of the arbitration since it was never raised at that stage.

To show that there was "manifest disregard," Petitioners need to demonstrate that the Arbitrator made a conscious decision to ignore a legal principle that is clear and explicitly applicable to the case. *Id.* Here, Petitioners presented their arguments on specific performance solely as a jurisdictional issue, and the petition here assumes it was somehow incumbent upon the Arbitrator to consider specific performance as part of the merits stage of the arbitration *sua sponte.* Accordingly, because of Petitioners' limited approach to the specific performance issue, it would have been impossible for the Arbitrator to acknowledge or be "aware" of a dispute over the law on specific performance, at the merits stage. In other words, the specific performance issue (now hotly contested in this Court as part of an argument about the merits of the Final Award) was never fairly or properly before the Arbitrator. Significantly, Petitioners are **not** contending in the instant petition that the Arbitrator lacked jurisdiction or that lack of jurisdiction constituted a manifest disregard of the law. Indeed, Petitioners conceded that they are not challenging the Arbitrator's jurisdictional ruling; rather, are asserting manifest disregard on the merits of the Final Award's remedy of specific performance. Hearing Transcript at 21:4-14. In this Court, Petitioners have changed streams and now argue for the first time that there was manifest disregard of the law on specific performance as a merits argument. Thus, as an additional basis for denying the petition here, the Court finds that Petitioners failed to make the Arbitrator legally "aware" of the specific performance issue as going to the merits of the arbitration, and thus failed to establish this element of "manifest disregard".

Furthermore, by raising this issue only in the context of jurisdictional arguments before the Arbitrator, Petitioners failed to preserve specific performance as a substantive challenge to the merits of the case. In the context of an appeal, arguments not raised at the appropriate stage of a proceeding are deemed waived. *Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir. 2003) (citing *In re Am. West Airlines*, 217 F.3d 1161, 1165 (9th Cir. 2000)) ("This issue is raised for the first time on appeal, and we therefore treat the issue as waived."). Here, this Court has even less authority or latitude to review the Final Award than would an appellate court reviewing a trial court decision. *See Kyocera Corp.*, 341 F.3d at 994 ("Neither erroneous legal conclusions nor unsubstantiated factual findings justify federal court review of an arbitral award under the statute, which is unambiguous in this regard."). Thus, by analogy, failure to preserve an

United States District Court
Northern District of California

issue for purposes of a petition to vacate should be applied more stringently than in the judicial appellate context. Indeed, the Tenth Circuit in *Goldgroup Res., Inc. v. DynaResource de Mexico, S.A. de C.V.*, 994 F.3d 1181, 1187 (10th Cir. 2021), found failure to preserve arguments which were not properly preserved or raised at the arbitration stage. In *Goldgroup*, the Petitioner failed to adequately raise its argument regarding the purported waiving of the arbitration clause to the arbitrator there. *Id.* As such, the Tenth Circuit held "[Petitioner] DynaResources cannot rely on [Respondent] Goldgroup's district court filings to preserve an issue it [Petitioner] failed to adequately raise below of reserve for appeal. The district court *therefore was not required to rule* on the substantive waiver issue, and [Petitioner] DynaResources has not preserved the issue for our review.")." *Id.* (emphasis added) (citation omitted). Here, the distinction between jurisdictional arguments and substantive merits is significant, because to show "manifest disregard" requires first showing that the Arbitrator was made aware of the legal issue in dispute. Here, he was not made aware that Petitioners disputed this issue as a merits issue going to remedies. Accordingly, for this further reason, the Court finds that Petitioners' failure to timely raise specific performance as a substantive legal argument at the merits stage results in a failure to preserve (and thus a waiver) of that argument in this proceeding.

If this Court were to grant the petition, issues which are briefed only on one limited subset of issues before an arbitrator could always lead to an argument for vacatur if the arbitrator rules against a party's desired outcome on the ultimate merits. Essentially, Petitioners' arguments invite sandbagging of arbitrators by raising issues in a limited fashion during arbitration, and then (if a party were to lose the arbitration) arguing to a court that the arbitrator manifestly disregarded the law in a context entirely different from the way it was raised with the arbitrator in the first instance. This would tend to undermine the purposes of the FAA, which is meant to streamline international arbitration. *See AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 335 (2011).

Accordingly, for all the reasons stated, the Court finds Petitioners failed to demonstrate by sufficiently specific evidence or arguments to meet the "high hurdle" required to vacate the Final Award due to a purported showing of a manifest disregard of law regarding specific performance as a form of relief under Hungarian law. *Stolt-Nielsen S.A.,* 559 U.S. at 671. As noted, the Parties

1    agreed that the resolution of this "manifest disregard" issue also necessarily resolves the issue of

2    whether or not the Arbitrator exceeded his powers.  Hearing Transcript at 32:7-18.  Accordingly,

3    the Court finds that the Arbitrator did not exceed his powers here.

**b. Whether the Arbitrator Displayed a Manifest Disregard of the Law Regarding the Substitution of Shareholder Votes with a Declaration.**

6    Petitioners aver the Arbitrator exhibited a manifest disregard of law by ignoring Hungarian

7    Civil Code in awarding BitCenter the right to substitute Petitioners' vote with a declaration if

8    Petitioners refused to perform their conversion-related obligations at a shareholders' meeting.  [Dkt.

9    1-2 at 11].   Petitioners aver Section 6:184 of the Hungarian Civil Code permits substitute

10   declarations solely in instances of missing votes, not in situations involving votes cast incorrectly.

11   *Id.* at 14.  By casting their votes in conjunction with XAPT's Articles of Association, Petitioners

12   aver there is no missing declaration and argue that awarding a substitute declaration breaches the

13   separation of Hungarian contract and corporate law.  *Id.*  Petitioners further argue that the case the

14   Arbitrator "relied upon in the Final Award" to justify the grant of the remedy of asubstitute

15   declaration is "inapposite" because the issue adjudicated pertained solely to a contract claim without

16   intersection with corporate law.  *Id.*

17   BitCenter avers the Arbitrator "analyz[ed] the arguments and rejected New Frontier's

18   arguments before ruling that such relief was appropriate."  [Dkt. 16 at 5].  BitCenter concludes by

19   claiming the Arbitrator "did not ignore or disregard any law, at best [the Arbitrator's] findings

20   amount to an error of law[.]"  *Id.* at 6.

21   Here, the Court finds Petitioners do not point to specific facts which amount to the Arbitrator

22   displaying a manifest disregard of the law.  *Emps. Ins. Of Wausau*, 933 F.2d at 1489.  Petitioners

23   concede the Arbitrator acted "based upon its determination" that Hungarian law did not forbid the

24   award of a substitute declaration.  [Dkt. 1-2 at 8].  Reduced to its essence, Petitioners argue the

25   Arbitrator made an "erroneous legal conclusion."  This type of error is insufficient to warrant

26   vacatur.  *Kyocera Corp.*, 341 F.3d at 994.  The Arbitrator's determination was based upon an

27   interpretation of Hungarian Civil code.  [Dkt. 1-2 at 16].  As Petitioners concede this "contrary

28   interpretation" remains merely that—an interpretation.  *Id.* at 11.  Whether the Arbitrator's

United States District Court
Northern District of California

17

1   conclusions about Section 6:184 of the Hungarian Civil Code or his decision to order equitable relief

2   in the form of a substitute declaration were erroneous remains outside the Court's purview to

3   determine.  *See Kyocera Corp.*, 341 F.3d at 994 (citing *French v. Merrill Lynch, Pierce, Fenner &*

4   *Smith, Inc.*, 784 F.2d 902, 906 (9th Cir. 1986)) ("[C]onfirmation [of an arbitration award] is required

5   even in the face of . . . misinterpretations of law.").

6          Accordingly, the Court finds Petitioners fail to point to specific evidence to meet the "high

7   hurdle" required to vacate the arbitration award due to a purported showing of a manifest disregard

8   of law regarding the substitution of shareholder votes with a declaration.  *Stolt-Nielsen S.A.,* 559

9   U.S. at 671.  Because the Parties agreed that the resolution of this "manifest disregard" issue also

10  necessarily resolves the issue of whether or not the Arbitrator exceeded his powers, the Court finds

11  that the Arbitrator did not exceed his powers here.  Hearing Transcript at 32:7-18.

12              **c.  Whether the Arbitrator Displayed a Manifest Disregard of the Law**
                    **Regarding New FDI Act.**
13

14         Petitioners next argue the Hungarian law referred to as the New FDI Act "expressly" requires

15  governmental approval prior to acquisition of equity in a Hungarian company by a foreign entity.

16  [Dkt. 1-2 at 14.]  Petitioners contend the Final Award seemingly gives BitCenter the "unlimited"

17  power to enforce the transfer of shares at any time and in any manner BitCenter pleases.  *Id.* The

18  Final Award allegedly breaches the New FDI Act due to this purported limitless authority

19  concerning the timing of approval.  *Id.*  In support of this contention, Petitioners cite the expert

20  opinion of their attorney, which states that the Final Award is subject to approval by the Minister of

21  Economic Development and highlights the unpredictability of such approval requests.  [Dkt. 1-3 at

22  12–14].

23         BitCenter concedes that the New FDI Act applies to the acquisition of XAPT shares.  [Dkt.

24  1-4 at 20].  BitCenter, however, avers that they cannot apply for Hungarian government approval

25  until the adoption of the relevant shareholder resolutions.  *Id.*  BitCenter asserts it "shall submit a

26  notification to the competent minister within 10 days of the adoption of the shareholders' resolution"

27  and "has no intention to circumvent any Hungarian law requirements and will take the necessary

28  actions at the appropriate time."  *Id.*  Petitioners failed to provide "reason to doubt th[e]

United States District Court
Northern District of California

representation" that BitCenter would not comply with the New FDI Act.  *Id.*  Consequently, the Arbitrator concluded that the award complied with the New FDI Act, and non-compliance with the Act's provisions would be BitCenter's burden to bear.  *Id.*

The Court does not find a manifest disregard of the law here by the Arbitrator.  Petitioners fail to specifically point to where the New FDI Act "expressly" requires governmental approval before an acquisition and fail to specifically point where approval is "expressly" required before acquisition.  [Dkt. 1-3 at 12–14].  Petitioners also fail to point to where they showed the Arbitrator that the New FDI Act "expressly" requires governmental approval.  Petitioners' argument is not "well defined, explicit, and clearly applicable."  *Collins*, 505 F.3d at 880 (citation and quotation marks omitted).

In light of the highly deferential standard regarding the review of arbitration awards, the Court finds the Arbitrator did not display a manifest disregard of the law.  Petitioners do not meet the high hurdle required to "show that the arbitrator understood and correctly stated the laws but proceeded to disregard the same."  *HayDay Farms*, 55 F.4th at 1241 (citing *Bosack*, 586 F.3d at 1104).  Finally, Because the Parties agreed that resolving the "manifest disregard" issue also necessarily resolves the "exceeded powers" issue, the Court finds that the Arbitrator did not exceed his powers here.  Hearing Transcript at 32:7-18.

### 2.   Whether the Arbitrator's Final Award was Completely Irrational.

Petitioners next seek to vacate the final award because the award is purportedly completely irrational.  An award is completely irrational "only where the arbitration decision fails to draw its essence from the agreement."  *Lagstein*, 607 F.3d at 642 (quoting *Comedy Club,* 553 F.3d at 1288).  An arbitration award "draws its essence from the agreement if the award is derived from the agreement, viewed in light of the agreement's language and context, as well as other indications of the parties' intentions."  *Bosack*, F.3d at 1106 (quoting *McGrann v. First Albany Corp.*, 424 F.3d 743, 749 (8th Cir. 2005)).  An award shall not be vacated as being completely irrational if the decision reflects "a plausible interpretation of the contract."  *Id.* (quoting *U.S. Life Ins. Co. v. Superior Nat. Ins. Co.*, 591 F.3d 1167, 1177 (9th Cir. 2010)).

Here, Petitioners merely state in their petition that the Arbitrator's award was completely

irrational, but Petitioners do not advance any detailed arguments, provide an expert declaration supporting an argument, or cite any applicable case law.  *See* Dkt. 1-2 at 15.  Courts need not determine the merits of an argument that is without justification.  *See Hernando v. Hamamoto*, 627 F.App'x 627, 628 (9th Cir. 2015) (citing *Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994)) ("We review only issues which are argued specifically and distinctly in a party's opening brief").  Indeed, at oral argument, the entire focus of the Parties was on "manifest disregard" (discussed above) and "public policy" (discussed below).  Accordingly, the Court finds Petitioner, as the petitioning party, failed to advance an argument that the Arbitrator's award was irrational and accordingly the Court finds that the Petitioners are not entitled to vacatur of the award for failure to adequately address the merits of this argument.  *Id.*

### B.      Whether the Arbitrator's Final Award is Contrary to Public Policy.

As explained above, review of an arbitration decision is "limited and highly deferential."  *Coutee*, 336 F.3d at 1132 (quoting *Sheet Metal Workers' Int'l Ass'n Loc. Union No. 359*, 84 F.3d at 1190); *Matthews*, 688 F.3d at 1111 (quoting *United Food & Com. Workers Int'l Union, Loc. 588 v. Foster Poultry Farms*, 74 F.3d 169, 173 (9th Cir. 1995)).  "One *narrow* exception to this rule is when the arbitration award is contrary to public policy."  *Matthews*, 688 F.3d at 1111 (emphasis added).  Vacating on public policy grounds "applies only when confirmation or enforcement of a foreign arbitration award would *violate the forum state's* most basic notions of morality and justice."  *Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Cubic Def. Sys., Inc.*, 665 F.3d 1091, 1097 (9th Cir. 2011) (citations and internal quotations omitted) (emphasis added).  "Although this defense is frequently raised, it 'has rarely been successful.'"  *Id.* (quoting Andrew M. Campbell, Annotation, *Refusal to Enforce Foreign Arbitration Awards on Public Policy Grounds*, 144 A.L.R. Fed. 481 (1998 & supp.)).

"[T]he question of public policy is ultimately one for resolution by the courts." *Foster Poultry Farms*, 74 F.3d at 174 (quoting *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 43 (1987)). "[C]ourts should be reluctant to vacate arbitra[tion] awards on public policy grounds."  *Id.* (quoting *Arizona Elec. Power Co-op., Inc. v. Berkeley*, 59 F.3d 988, 992 (9th Cir. 1995)).  "The party seeking to vacate the award bears the burden of showing that it is contrary to

United States District Court
Northern District of California

public policy." *Laborers' Int'l Union of N. Am., Loc. 169 v. Penta Bldg. Grp., Inc.*, 853 F. App'x 67, 72 (9th Cir. 2021) (citing *Foster Poultry Farms*, 74 F.3d at 174).

Here, Petitioners in their briefs seek to vacate the Arbitrator's award citing violations of Hungarian public policy. [Dkt. 1-2 at 19–20]. Petitioners base their argument on an alleged distinction between contract and corporate law by Hungarian Law which is "one of the fundamental pieces of legislation regulating the socio-economic order of Hungary." *Id.* at 19–20. Petitioners further argued that enforcing specific performance when a shareholder vote cast in compliance with a company's articles of association directly violates Hungarian public policy. *Id.* Additionally, Petitioners argued that the Arbitrator's bypassing of the New FDI Decree—enacted "due to the state of emergency created by the war in Ukraine"—violates Hungarian public policy. *Id.*

Petitioners concede their public policy arguments rely on purported violations of *foreign* public policy and not United States public policy. [Dkt. 1-2 at 19 ("Hungarian public policy, if considered in determining whether to vacate the Dispute Orders, simply does not allow for the Dispute Orders.")]. At the hearing on this petition, Petitioners withdrew their Hungarian public policy arguments, conceding that only U.S. public policy is relevant to vacatur on public policy grounds, and admitted that the arguments about Hungarian public policy in their petition are "very challenging" for purposes of vacatur under controlling law here. ; Hearing Transcript at 37:5-11, 45:2-22; *Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran*, 665 F.3d at 1097. The relevant public policy is that of the country where vacatur is sought and where this Court sits, the United States—not Hungary. *Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran*, 665 F.3d at 1097. At the hearing on this petition, Petitioners admit that they are not arguing that there is a violation of domestic United States public policy at issue here. Hearing Transcript at 44:23-45:1. Petitioners concede no case law exists which indicates a violation of *foreign* public policy justifies vacatur of an arbitration award here. [Dkt. 20 at 13 n.4]. Indeed, the Court could not identify any case law which supports Petitioners' foreign public policy argument. At oral argument, Petitioners conceded that this Court can only vacate the awared if it is found to violate California or U.S. public policy under both the FAA and the New York Convention. Hearing Transcript at 44:11-22.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   At the hearing, Petitioners argued that the Hungarian public policies discussed above impact

2   the "manifest disregard" issue because those public policies should have made the Arbitrator aware

3   of the law here (particularly the alleged distinction between commercial and corporate law).

4   Hearing Transcript at 36:24-37-4, 45:23-46:13.  As discussed above, the Court finds Petitioners

5   arguments on "manifest disregard" insufficient to warrant vacatur, even taking into account the

6   additional arguments raised for the first time at oral argument based on Hungarian public policy.

7   Accordingly, the Court finds the Arbitrator's award does not violate an explicit, well-

8   defined, and dominant public policy of either California or the United States, and vacatur on public

9   policy grounds is not warranted due to Petitioners' withdrawal of this argument..

## CONCLUSION

11   For the reasons explained above, the Court finds the Arbitrator did not exceed his powers

12   under the statutory grounds in the FAA, did not exhibit a manifest disregard of the law, and did not

13   produce an award which is completely irrational.  Further, the Court finds no reasons exist to vacate

14   the award here on public policy grounds.  Accordingly, the Court **DENIES** Petitioners' Petition to

15   Partially Vacate the Arbitration Award pursuant to 9 U.S.C. §§ 10 and 201. [Dkt. 1].

**IT IS SO ORDERED.**

Dated: February 6, 2024

_____
PETER H. KANG
United States Magistrate Judge